UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

THE   NEWS-PRESS,   division   of
Multimedia  Holdings  Corporation,
CAPE PUBLICATIONS, INC., publisher
of Florida Today, PENSACOLA NEWS-
JOURNAL,   division   of   Multimedia
Holdings Corporation,

                 Plaintiffs,

vs.                                    Case No.  2:05-cv-102-FtM-29DNF

UNITED STATES DEPARTMENT OF HOMELAND
SECURITY, and its component Federal
Emergency Management Agency,

                 Defendant.

_____

## OPINION AND ORDER

      This matter comes before the Court on Defendant's Motion for
Summary Judgment (Doc. #37) filed on August 10, 2005, and
Plaintiffs' Motion for Summary Judgment (Doc. #46), filed on
September 7, 2005.  Both sides filed Responses (Docs. #48, 52) to
the other's motion.  The Court heard oral argument on September 30,
2005.  Both parties, with the permission of the Court, filed a
supplemental memorandum.  (Docs. #57, 58).  On October 31, 2005,
defendant filed certain documents *in camera* (Doc. #S-1), as
directed by the Court (Doc. #63).

**I.**

In August and September, 2004 portions of the State of Florida sustained damage as the result of Tropical Storm Bonnie, Hurricane Charley, Hurricane Frances, Hurricane Ivan, and Hurricane Jeanne (collectively the 2004 Florida Hurricanes).  After each of the 2004 Florida Hurricanes, the President of the United States issued a major disaster declaration pursuant to the Robert T. Stafford Disaster Relief and Emergency Assistance Act (the Stafford Act), 42 U.S.C. § 5121 *et seq.*, and directed the Federal Emergency Management Agency (FEMA) to provide federal disaster assistance to the affected areas.  Plaintiff media outlets and others thereafter raised issues concerning the manner in which FEMA distributed the emergency aid, the amounts of aid obligated, and the legitimacy of individual claims for relief.  Plaintiffs filed three requests for information pursuant to the Freedom of Information Act (FOIA), which were ultimately amended to include all 2004 Florida Hurricanes.

On October 29, 2004, plaintiffs filed Request No. 05-019, which requested three categories of documents.  First, plaintiffs requested documents and information relating to the Presidential declarations of a major disaster.  FEMA's May 4, 2005 response produced approximately 150 pages of documents but withheld fifteen pages of documents and redacted certain information from other documents produced, including the initials and names of employees

and officials who reviewed preliminary drafts and the recommended courses of actions before they were finalized.

Second, plaintiffs requested documents relating to public assistance, including disaster project worksheet summaries separated by county and including the applicant's name and site number locations. FEMA's April 19, 2005, response was one compact disc (CD) containing a 405-page chart of Project Worksheet Summaries for Project Worksheet, which did not withhold any information.

Third, plaintiffs requested documents relating to individual assistance awards separated by zip codes and county, including recipient names and addresses. FEMA's March 24, 2005, response withheld the names and addresses of approximately 605,500 applicants but provided seven CDs of data stored on FEMA's National Emergency Management Information System (NEMIS), which if printed would total almost one million pages. For each disaster assistance applicant, the data included disaster number, zip code, county, registration identification, category of assistance, assistance status, assistance type, assistance status detail, eligibility date, approved date, eligibility amount, determination type, and ownership. The data also included inspection information by individual applicant, including line item description, quantity recorded, SBA status, water level, cause of damage, insurance status for line item, personal property description, clothing, miscellaneous line description, generic room, essential tool item

-3-

description, real property damage item description, damage level, item amount, and damage type.

On November 4, 2004, plaintiffs filed Request No. 05-020, which requested an electronic spreadsheet showing all flood claims from FEMA's National Flood Insurance Program (NFIP) for Florida in 2004.  FEMA's March 4, 2005, response provided one CD containing a spreadsheet and code key, but withheld records containing the applicants' addresses.

On February 15, 2005, plaintiffs filed Request No. 05-113, which requested documents related to FEMA's contracts with companies to provide disaster housing inspection services, specifically with the Partnership for Response and Recovery (PaRR Inspections), a joint venture of URS Corp., Dewberry & Davis, LLC and Scientific Service, Inc., and Alltech, Inc., a subsidiary of Parsons Brinckerhoff.  FEMA's May 7, 2005, response included over 350 pages of documents consisting of contracts and inspections, but withheld the inspectors' compensation rate, the names of key personnel, and the drafts of Section J of the contracts, and redacted portions of the final version of Section K of the contracts.

On March 9, 2005, plaintiffs filed their Complaint (Doc. #1); on March 16, 2005, plaintiffs filed an Amended Complaint (Doc. #6); and on June 3, 2005, plaintiffs filed their Second Amended Complaint (Doc. #27).  Count I of the Second Amended Complaint alleged that defendants violated FOIA by failing to respond to the

-4-

requests in a timely manner.  Plaintiffs concede this count is moot, except for possible attorney fees and costs.  (Doc. #48, p. 6).  Count II alleges that defendants violated FOIA by improperly withholding documents for which no exemption was applicable. Defendant filed its Answer (Doc. #30) on June 23, 2005.  Also before the Court are <u>Vaughn</u> Indices and Affidavits (Doc. #31); Redacted Documents Disclosed in Response to Plaintiffs' FOIA Request (Docs. #32, 33, 34, 44); Amended Vaughn Indices (Doc. #38); and Declarations (Docs. #47, 49).  Pursuant to an Order (Doc. #63) filed after oral arguments, defendant filed certain of the contested documents *in camera* for the Court's *ex parte* review. (Doc. #S-1).

## II.

The purpose of the Freedom of Information Act, 5 U.S.C. § 552, "is to encourage public disclosure of information so citizens may understand what their government is doing." <u>Office of the Capital Collateral Counsel v. Department of Justice</u>, 331 F.3d 799, 802 (11th Cir. 2003).  FOIA requires government agencies to disclose to the public any requested document unless the agency proves that the document fall within one of nine statutory exemptions.  <u>Moye, O'Brien, O'Rourke, Hogan & Pickert v. National R.R. Passenger Corp.</u>, 376 F.3d 1270, 1276-77 (11th Cir. 2004).  Because the purpose of FOIA is to encourage disclosure, its disclosure requirements are construed broadly, its exemptions are construed

narrowly, and the government bears the burden of proving a requested document is exempted. Id. at 1277.[1]  While FOIA allows an agency to withhold information within one of the exemptions, it does not limit the agency's discretion to disclose such exempt information if it sees fit. Chrysler Corp. v. Brown, 441 U.S. 281, 293-94 (1979).

The Privacy Act also comes into play in this case.  The Privacy Act provides in pertinent part that "[n]o agency shall disclose any record which is contained in a system of records . . . except pursuant to a written request by, or with the prior consent of, the individual to whom the record pertains, unless disclosure of the record would be . . . (2) required under section 552 of this title [FOIA]."  5 U.S.C. § 552a(b)(2).  "The Privacy Act was passed in 1974 to protect the privacy of individuals identified in government information systems by regulating the

---

[1]A long and virtually unbroken line of Supreme Court cases have repeatedly articulated these general principles. EPA v. Mink, 410 U.S. 73 (1973); National Labor Relations Bd. v. Sears, Roebuck & Co., 421 U.S. 132, 136 (1975); Department of the Air Force v. Rose, 425 U.S. 352, 361 (1976); Federal Open Mkt. Comm. v. Federal Reserve Sys., 443 U.S. 340 (1979); Chrysler Corp. v. Brown, 441 U.S. 281 (1979); United States v. Weber Aircraft Corp., 465 U.S. 792, 793-94 (1984); United States Dep't of Justice v. Reporters Comm. for Freedom of the Press, 489 U.S. 749 (1989); John Doe Agency v. John Doe Corp., 493 U.S. 146 (1990); United States Dep't of State v. Ray, 502 U.S. 164 (1991); United States Dep't of Justice v. Landano, 508 U.S. 165 (1993); United States Dep't of Def. v. Federal Labor Relations Auth., 510 U.S. 487 (1994); Bibles v. Oregon Natural Desert Ass'n, 519 U.S. 355 (1997); Department of the Interior and Bureau of Indian Affairs v. Klamath Water Users Protective Ass'n, 532 U.S. 1 (2001); National Archives and Records Admin. v. Favish, 541 U.S. 157 (2004).

collection, maintenance, use and dissemination of personal information and prohibiting unnecessary and excessive exchange of such information within the government and to outside individuals." Cochran v. United States, 770 F.2d 949, 954 (11th Cir. 1985). The Privacy Act was enacted in large part in response to concern over the impact of computer data banks on individual privacy. United States Dep't of Justice v. Reporters Comm. for Freedom of the Press, 489 U.S. 749, 766 (1989).

While the Privacy Act and FOIA have contradictory purposes, the relationship between the two statutes is well-established: "the Privacy Act expressly defers to the mandatory disclosure requirements of the FOIA by prohibiting the nonconsensual release of personal information unless the information is required to be disclosed under the FOIA. The net effect [of § 552a(b)(2)] is to permit disclosure where the FOIA requires it, but to prohibit disclosure where the FOIA allows the agency to refuse to disclose." Cochran, 770 F.2d at 954-55 (internal citation and quotation omitted).

As is often the case, the disputes in this case center around the scope of various FOIA exemptions. The Court will discuss generally the contours of each arguably applicable exemption, and then conduct a *de novo* review of FEMA's claims of exemption, as required by 5 U.S.C. § 552(a)(4)(B). If the information falls within one of the statutory exemptions, the Court's inquiry is over and FOIA does not require disclosure of that information. National

-7-

<u>Labor Relations Bd. v. Sears, Roebuck & Co.</u>, 421 U.S. 132, 147-48 (1975).

**A. Exemption 2:**

Exemption 2 allows a government agency to withhold from disclosure materials "related solely to the internal personnel rules and practices of an agency." 5 U.S.C. § 552(b)(2). "[T]he general thrust of the exemption is simply to relieve agencies of the burden of assembling and maintaining for public inspection matter in which the public could not reasonably be expected to have an interest." <u>Department of the Air Force v. Rose</u>, 425 U.S. 352, 369-70 (1976). The Court considers whether the matter is one of merely internal significance, or concerns only routine matters, or entails administrative burden. <u>Id.</u> at 370. Generally, Exemption 2 is not applicable to matters which are of a genuine and significant public interest. <u>Id.</u> at 369.

**B. Exemption 4:**

Exemption 4 allows a government agency to withhold from disclosure "trade secrets and commercial or financial information obtained from a person and privileged or confidential." 5 U.S.C. § 552(b)(4); <u>Brown</u>, 441 U.S. at 291. "In order for information to be within exemption 4, it must be either a trade secret or (1) commercial or financial information, (2) obtained from a person, and (3) privileged or confidential." <u>The Miami Herald Publ'g Co.</u>

v. United States Small Business Admin., 670 F.2d 610, 613 (5th Cir. 1982)(Unit B).[2]

## C. Exemption 5:

Exemption 5 allows a government agency to withhold from disclosure "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency."  5 U.S.C. § 552(b)(5).  "To qualify, a document must thus satisfy two conditions: its source must be a Government agency, and it must fall within the ambit of a privilege against discovery under judicial standards that would govern litigation against the agency that holds it." Department of the Interior and Bureau of Indian Affairs v. Klamath Water Users Protective Ass'n, 532 U.S. 1, 8 (2001).

Only those documents normally privileged in the civil discovery context are within the scope of Exemption 5. Sears, 421 U.S. at 148-49; Moye, O'Brien, O'Rourke, Hogan & Pickert, 376 F.3d at 1277; Florida House of Representatives v. United States Dep't of Commerce, 961 F.2d 941, 944 (11th Cir. 1992).  Protection from disclosure extends to documents which are within the deliberative process privilege, Moye, O'Brien, O'Rourke, Hogan & Pickert, 376

---

[2]In Stein v. Reynolds Sec., Inc., 667 F.2d 33, 34 (11th Cir. 1982) the Eleventh Circuit adopted as binding precedent all of the post-September 30, 1981 decisions of Unit B of the former Fifth Circuit.

F.3d at 1277;   Florida House of Representatives, 961 F.2d at 945,

which is the only privilege FEMA asserts in this case.[3]

The purpose of the deliberative process privilege is "to allow agencies to freely explore possibilities, engage in internal debates, or play devil's advocate without fear of public scrutiny." Moye, O'Brien, O'Rourke, Hogan & Pickert, 376 F.3d at 1277. More simply, "[t]he underlying purpose of the deliberative process privilege is to ensure that agencies are not forced to operate in a fish bowl." Id. at 1278. "The deliberative process privilege rests on the obvious realization that officials will not communicate candidly among themselves if each remark is a potential item of discovery and front page news, and its object is to enhance the quality of agency decisions by protecting open and frank discussions among those who make them within the Government." Klamath Water Users Protective Ass'n, 532 U.S. at 8-9 (internal citations and quotations omitted). "Thus, Exemption 5 covers documents reflecting advisory opinions, recommendations, and deliberations comprising part of a process by which government decisions and policies are formulated." Moye, O'Brien, O'Rourke, Hogan & Pickert, 376 F.3d at 1277.

To come within the scope of the deliberative process privilege, the document must be both "predecisional" and

---

[3]As discussed later, FEMA has not (and cannot) assert a claim of executive privilege on behalf of the President of the United States.

"deliberative." Id. at 1277; Florida House of Representatives, 961 F.2d at 945. "A 'predecisional' document is one prepared in order to assist an agency decision-maker in arriving at his decision and may include recommendations, draft documents, proposals, suggestions, and other subjective documents which reflect the personal opinions of the writer rather than the policy of the agency" so long as the document is not merely peripheral to actual policy formulation. Moye, O'Brien, O'Rourke, Hogan & Pickert, 376 F.3d at 1277-78. "A document is 'deliberative' if the disclosure of the materials would expose an agency's decision-making process in such a way as to discourage candid discussion within the agency and, thereby, undermine the agency's ability to perform its function." Id. at 1278. "Therefore, courts must focus on the effect of the material's release, and conclude that predecisional materials are privileged to the extent that they reveal the mental processes of decisionmakers." Id. (internal citation and quotation omitted).

Additionally, there is a distinction for Exemption 5 purposes between factual data and opinion data. "[F]actual information generally must be disclosed and materials embodying officials' opinions are ordinarily exempt from disclosure." Id. at 1278. See also Florida House of Representatives, 961 F.2d at 947-50. Thus, "the deliberative process privilege does not protect purely factual material contained in privileged documents if the disclosure of such information would not reveal the nature of the deliberations."

_Judicial Watch, Inc. v. Department of Energy_, 412 F.3d 125, 131 (D.C. Cir. 2005)(citing _EPA v. Mink_, 410 U.S. 73, 87-88 (1973)).

**D.  Exemption 6:**

Exemption 6 allows a government agency to withhold from disclosure "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6). This exemption has three basic requirements: First, the documents must be personnel, medical or similar files; second, disclosure of the documents must constitute an invasion of personal privacy; and third, the personal privacy invasion must be clearly unwarranted. _United States Dep't of State v. Ray_, 502 U.S. 164, 171 (1991); _Rose_, 425 U.S. at 381-82. A court is required to balance the public interest in disclosure against the individual's right of personal privacy. _United States Dep't of Def. v. Federal Labor Relations Auth._, 510 U.S. 487, 495 (1994); _Ray_, 502 U.S. at 175; _Rose_, 425 U.S. at 372. The ultimate issue is whether disclosure would constitute a clearly unwarranted invasion of the personal privacy of the individual within the meaning of the FOIA. _Federal Labor Relations Auth._, 510 U.S. at 495.

Exemption 6 applies broadly to "detailed Government records on an individual which can be identified as applying to that individual." _United States Dep't of State v. Washington Post Co._, 456 U.S. 595, 602 (1982). The exemption, however, does not create a blanket exemption for these types of files, and the government

must disclose nonconfidential matters which may be contained in such files.  Rose, 425 U.S. at 371-77.

A person's privacy interest may include an individual's interest in avoiding disclosure of personal events and facts, even if previously disclosed to the public in some form.  Reporters Comm. for Freedom of the Press, 489 U.S. at 762 (privacy interest in criminal record or "rap sheet").  The fact that the person is a public official, or that an event is not wholly private, does not render the interest in preserving personal privacy without weight.  Office of the Capital Collateral Counsel, 331 F.3d at 803.  Third parties who are identified in the documents also have a privacy interest that must be balanced against the public interest in disclosure.  Id. at 804.  "[D]isclosure of records regarding private citizens, identifiable by name, is not what the framers of the FOIA had in mind."  Reporters Comm. for Freedom of the Press, 489 U.S. at 765.

The only relevant public interest to be considered in this balancing process is the extent to which disclosure of the information sought would shed light on an agency's performance of its statutory duties or otherwise let citizens know what their government is up to.  Bibles v. Oregon Natural Desert Ass'n, 519 U.S. 355, 355-56 (1997); Federal Labor Relations Auth., 510 U.S. at 495, 497; Reporters Comm. for Freedom of the Press, 489 U.S. at 775.  Thus, "the FOIA's central purpose is to ensure that the Government's activities be opened to the sharp eye of public

-13-

scrutiny, not that information about *private citizens* that happens to be in the warehouse of the Government be disclosed." <u>Reporters Comm. for Freedom of the Press</u>, 489 U.S. at 774 (emphasis in original).  "Official information that sheds light on an agency's performance of its statutory duties falls squarely within [the FOIA] statutory purpose." <u>Id.</u> at 773.  The fact that the information may provide details for a news story is not, in itself, the kind of public interest protected by the FOIA. <u>Id.</u> at 774.

Whether an invasion of privacy is warranted cannot turn on the purposes for which the request for information is made. <u>Bibles</u>, 519 U.S. at 356; <u>Federal Labor Relations Auth.</u>, 510 U.S. at 496; <u>Reporters Comm. for Freedom of the Press</u>, 489 U.S. at 771.  The identity of the requesting party or the purpose for which the information is requested are generally not relevant to the determination of whether the invasion of privacy is warranted. <u>Federal Labor Relations Auth.</u>, 510 U.S. at 496; <u>Reporters Comm. for Freedom of the Press</u>, 489 U.S. at 721.  Thus, the rights of the media to disclosure are no different than the rights of any third party. <u>Reporters Comm. for Freedom of the Press</u>, 489 U.S. at 771. "Any peculiar interest of the requesting party is irrelevant to evaluating this general public interest." <u>Office of the Capital Collateral Counsel</u>, 331 F.3d at 803 (citing <u>John Doe Agency v. John Doe Corp.</u>, 493 U.S. 146 (1989)).  "Congress granted the scholar and the scoundrel equal rights of access to agency records." <u>Durns v. Bureau of Prisons</u>, 804 F.2d 701, 706 (D.C. Cir. 1986).

The Court may consider whether there is already substantial information available to the public about the agency conduct which may satisfy the public interest.  <u>Ray</u>, 502 U.S. at 178; <u>Office of the Capital Collateral Counsel</u>, 331 F.3d at 804.  "The availability of information through other sources lessens the public interest in its release through FOIA."  <u>Horowitz v. Peace Corps.</u>, __ F.3d __, 2005 WL 2806357, *5 (D.C. Cir. Oct. 28, 2005).

## III.

### (A)   Presidential Declaration Documents, Request No. 05-019:

The process by which a disaster declaration is issued is described by statute, 42 U.S.C. § 5121 *et seq.*, and regulation, 44 C.F.R. §§ 206.31-206.60, and in the Declaration of Daniel A. Craig (Doc. #37, Exhibit 2, ¶¶ 4-18)[4].  In summary, a State Governor submits a request for a major disaster or emergency declaration to the President of the United States through the appropriate FEMA Regional Director; the Regional Director prepares a summary for the Recovery Division Director based on information from the State and consultation with state, federal, and other interested parties; the Recovery Division seeks the concurrence/non-concurrence from all the program areas requested by the Governor, and ultimately provides the Under Secretary with a program recommendation; the

---

[4]All references in this section are to defendants' Notice of Filing Redacted Documents Disclosed in Response to Plaintiffs' FOIA Request No. 05-019 (Doc. #32) followed by the page number on the lower right hand corner of the attachment.

Under Secretary formulates a finding concerning the severity and magnitude of the disaster and a recommendation, which is forwarded to the President with the Governor's request.

Upon the declaration of a major disaster or emergency, the Governor and the FEMA Regional Director or designee execute a FEMA-State Agreement under which the federal disaster assistance will be provided.  The Governor may thereafter request that additional areas or types of federal assistance be authorized by the Under Secretary.  These additional requests are made to the Recovery Division Director through the appropriate Federal Coordinating Officer and Regional Director; the Recovery Division Director obtains the concurrence or non-concurrence from appropriate FEMA officials, and then recommends approval or denial of the request to the Under Secretary.

FEMA provides three broad categories of disaster assistance: Individual Assistance to individuals and households affected by the disaster; Public Assistance to state and local governments affected by the disaster; and Hazard Mitigation for projects that will result in protection from disaster damage to public or private property.  FEMA generally pays 75% of eligible Public Assistance work costs, but may recommend an increase in the federal share up to 90% under certain circumstances.  FEMA may also recommend up to 100% federal funding for emergency work under the Public Assistance program under certain circumstances.

On August 13, 2004, Florida Governor Jeb Bush requested that the President of the United States declare Florida a disaster area because of Tropical Storm Bonnie and Hurricane Charley. (Doc. #32 at 0072-92).[5]   FEMA withheld documents or portions of documents generated thereafter related to this and subsequent requests.  At oral argument plaintiffs withdrew their objection to the nondisclosure of the redacted portions of certain documents (Doc. #32 at 0014-0016, 0021-25, 0027, 0029, 0043, 0046, 0052, 0128, 0131, 0134, 0135-46) withheld pursuant to the deliberative process privilege of Exemption 5.  Reference to some of these documents may still be necessary, however, to place the withheld documents in context.

**(1) Under Secretary Brown's Initial Memorandum to President:** An August 13, 2004, FEMA Memorandum (Doc. #32 at 00125-128) concerning a Regional Disaster Summary of the State of Florida, and a FEMA Memorandum (Doc. #32 at 00129-136) concerning a Regional Analysis and Recommendation, State of Florida, were produced in redacted form [now without objection].  However FEMA withheld, pursuant to the deliberative process privilege of Exemption 5, the entirety of an August 13, 2004, Memorandum (Doc. #32 at 0065-69) from then-Under Secretary Michael D. Brown to President George W.

---

[5]The Declaration of Daniel A. Craig states (Doc. #37, Exhibit 2, pp. 10-11, ¶ 23) that FEMA withheld the entirety of Governor Bush's Request for a Major Disaster Declaration.  This appears to be incorrect, since the Governor's request is included in its entirety in FEMA's Response to plaintiffs' FOIA Request No. 05-019. (Doc. #32 at 0072-0092).

Bush which discussed Florida's request and contained supporting documentation.  Thereafter on August 13, 2004, President Bush signed a letter to former Under Secretary Brown declaring the State of Florida a major disaster area as the result of Tropical Storm Bonnie and Hurricane Charley.  (Doc. #32 at 0036-70).  Pursuant to the Stafford Act, President Bush authorized FEMA to allocate available funds; to provide Individual Assistance; to provide debris removal assistance and emergency protective measures under Public Assistance throughout the State; and to provide any other forms of assistance under the Stafford Act subject to completion of Preliminary Damage Assessments.  Federal funds were limited to 75 percent of the total eligible costs.  The President's authorization letter was fully disclosed by FEMA.

As an initial matter, the Court will revisit FEMA's recent suggestion that the memorandum to President Bush is protected by executive privilege (presidential communications privilege).  The entirety of the memorandum may be protected if this privilege was properly invoked, thus simplifying the Court's analysis.  The Court has again reviewed defendant's Motion for Summary Judgment (Doc. #37) and its Response to Plaintiffs' Motion for Summary Judgment (Doc. #52), and finds that executive privilege was not asserted; only the deliberative process privilege was asserted.  (Doc. #37, pp. 20-21,25-27; Doc. #52, pp. 10-12, 14-16).  FEMA relies on a single sentence in the Declaration of Danial A. Craig, the Director of the Recovery Division of the Department of Homeland Security,

Federal Emergency Management Agency: "Further, the request involves highly confidential and deliberative discussions and recommendations relating to the President's sole and un-delegated authority to declare a disaster, the disclosure of which would have a chilling effect on the Executive Branch's decision-making process." (Doc. #37-3 p. 10). This is clearly not an invocation of executive privilege. "Executive privilege is an extraordinary assertion of power 'not to be lightly invoked.'" Cheney v. United States Dist. Court for Dist. of Columbia, 124 S. Ct. 2576, 2592 (2004)(quoting United States v. Reynolds, 345 U.S. 1, 7 (1953)). Mr. Craig did not purport to speak for the President, and his official position is not such that he would necessarily have the authority to invoke the privilege on behalf of the President.

The Court has reviewed the August 13, 2004 Memorandum from former Under Secretary Brown to President Bush *in camera*. The Court concludes that withholding this Memorandum pursuant to the deliberative process privilege of Exemption 5 was proper in part. The Memorandum was clearly an inter-agency memorandum from one government agency to another. E.g., Renegotiating Bd. v. Grumman Aircraft Eng'g Corp., 421 U.S. 168, 188 (1975). The Memorandum was "predecisional" within the meaning of the deliberative process privilege because it was prepared in order to assist President Bush in deciding whether to grant the request to declare Florida a disaster area due to Tropical Storm Bonnie and Hurricane Charley, and was not merely peripheral to that decision. The Memorandum was

"deliberative" within the meaning of the deliberative process privilege because disclosure of the memorandum would expose the President's decision-making process in such a way as to discourage candid input from the Under Secretary and thereby undermine the President's ability to function properly.

Plaintiffs argue that any portion of the Under Secretary's Memorandum discussing non-deliberative, purely factual information must be disclosed, even under Exemption 5.  The Supreme Court has stated that "otherwise nonprivileged factual material cannot be withheld under Exemption 5 merely because it appears in the same document as privileged material." United States v. Weber Aircraft Corp., 465 U.S. 792, 800 n.17 (1984).  The Supreme Court went on to note that this aspect of its Mink decision was subsequently codified at 5 U.S.C. § 552(b), which provides "Any reasonably segregable portion of a record shall be provided to any person requesting such record after deletion of the portions which are exempt under this subsection."

The Court concludes that there are factual portions of the Memorandum which must be disclosed because they are reasonably segregable and not so intertwined with material protected by the deliberative process privilege as to make disclosure impractical. The August 13, 2004 Memorandum is divided into the following sections: "Event," "Background," "Recommendation," "Decision," "Attachment," "Detailed Discussion," and has an attached State Map showing the type(s) of assistance requested by the Florida Governor

-20-

by county.    The Court finds that the "Recommendation" and "Decision" sections of the Memorandum were properly withheld under the deliberative process privilege; the remaining sections must be disclosed.

Plaintiffs argue, however, that even a recommendation must be disclosed if incorporated into a final agency policy.  Plaintiffs state: "Once a recommendation has been adopted as policy, the decisions of the recommendation is no longer deliberative and, therefore, is not subject to Exemption 5. . . . Because these presidential acts adopted the Department's statements and interpretations, those matters are not subject to Exemption 5." (Doc. #48, p. 23).  Plaintiffs assert that because FEMA has failed to show that the Memorandum was not incorporated into final agency policy, its claimed exemption must be overruled.  The only binding precedent plaintiffs rely upon is Sears, 421 U.S. 132.

The Court disagrees.  The Supreme Court has not held that a recommendation loses its privileged status if it is accepted by the government decision maker, or that only unsuccessful recommendations are protected.  Rather, Sears stated "we hold that, if an agency chooses expressly to adopt or incorporate by reference an intra-agency memorandum previously covered by Exemption 5 in what would otherwise be a final opinion, that memorandum may be withheld only on the ground that it falls within the coverage of some exemption other than Exemption 5."  421 U.S. at 161.  See also Grumman Aircraft Eng'g Corp., 421 U.S. at 184-86; Florida House of

Representatives, 961 F.2d at 945 n.4.   An examination of the President's letter declaring Florida a disaster area (Doc. #32 at 0036) shows that the former Under Secretary's Memorandum was neither expressly adopted nor incorporated by reference.   Indeed, President Bush in the letter clearly states "I have determined . . ." and that "I . . . declare . . ." Florida a major disaster area. The reasons for the privilege distinctions discussed in Grumman Aircraft Eng'g Corp., 421 U.S. at 187 n.24, fully apply to the distinction between the Under Secretary's recommendation and the President's decision.

(2)   **Under Secretary Brown's Memorandum To President Re: Florida Cost Share Request:**   An August 15, 2004, FEMA Memorandum (Doc. #32 at 0052) forwarded a request by the Florida Governor's representative for certain percentages of the federal cost share for federal assistance based upon Tropical Storm Bonnie and Hurricane Charley, and contained a recommendation concerning this request.   FEMA produced this Memorandum, but redacted [now without objection] the recommendation.   An August 15, 2004, FEMA Memorandum (Doc. #32 at 0047-49, 0054-56) from former Under Secretary Brown to President Bush requested and offered recommendations pertaining to a cost-sharing adjustment for Florida.   FEMA withheld the entirety of this memorandum pursuant to the deliberative process privilege of Exemption 5.   On August 16, 2004, President Bush wrote to Governor Bush and Under Secretary Brown advising them that the

damage from Tropical Storm Bonnie and Hurricane Charley was of sufficient severity and magnitude that he was amending his August 13 declaration and authorizing federal funds for debris removal and emergency protective measures at 100 percent of total eligible costs for the first 72 hours and 100 percent for direct Federal assistance.  (Doc. #32 at 0050-51; 0057-60).  The entirety of the President's letters were disclosed by FEMA.

For the reasons stated in Section III(A)(1), the Court rejects FEMA's suggestion that this August 15, 2004 Memorandum was withheld pursuant to a valid assertion of executive privilege.

The Court has reviewed the August 15, 2004 Memorandum from former Under Secretary Brown to President Bush *in camera*.  The Court concludes that withholding this Memorandum pursuant to the deliberative process privilege of Exemption 5 was proper in part for the same reasons discussed in Section III(A)(1) above.  The Memorandum was clearly an inter-agency memorandum from one government agency to another.  The Memorandum was "predecisional" within the meaning of the deliberative process privilege because it was prepared in order to assist President Bush in deciding whether to grant Florida's request that the federal share of the costs from Tropical Storm Bonnie and Hurricane Charley be increased, and was not merely peripheral to that decision.  The Memorandum was "deliberative" within the meaning of the deliberative process privilege because disclosure of the memorandum would expose the President's decision-making process in such a way as to discourage

candid input from FEMA and thereby undermine the President's ability to function properly.  President Bush did not expressly adopt or incorporate the Memorandum in his final decision.  The "Background" and "Attachments" portion of the Memorandum must be disclosed as reasonably segregable factual material, while the "Recommendation" and "Decision" portions of the Memorandum were properly withheld under the deliberative process privilege.

**(3) Florida County Add-On Request:**  An August 20 2004, FEMA Memorandum (Doc. #32 at 0025) forwarded a copy of the Florida Governor's representative's letter requesting the addition of twelve Florida counties for Public Assistance Categories C-G, and one county for Individual Assistance (Doc. #32 at 0026).  FEMA produced this Memorandum, but pursuant to Exemptions 2 and 6 redacted the identities of the FEMA employees who reviewed the request and their signatures as either concurring or not concurring in the request.  In its summary judgment motion, FEMA asserted for the first time that Exemption 5 also justified the redaction of this information.  The identity and signature of the official who authored the Memorandum and the identity of the official to whom the Memorandum was sent were not redacted.

As noted earlier, Exemption 2 allows a government agency to withhold from disclosure materials "related solely to the internal personnel rules and practices of an agency."  5 U.S.C. § 552(b)(2).  Exemption 2 applies to material used for predominantly internal purposes and which relates to trivial administrative matters of no

genuine public interest.  <u>Schiller v. National Labor Relations Bd.</u>, 964 F.2d 1205, 1207 (D.C. Cir. 1992).  "This exemption applies to 'routine matters' of 'merely internal significance' in which the public lacks any substantial or legitimate interest."  <u>Lesar v. United States Dep't Of Justice</u>, 636 F.2d 472, 485 (D.C. Cir. 1980)(footnote citations omitted).

The Court finds that the identities of FEMA employees who reviewed the Florida request and their signatures attesting to their concurrence or non-concurrence are well within Exemption 2. The review process of a county add-on request is a predominantly internal matter and the Memorandum was used for such internal purposes.  The names and signatures of FEMA employees who reviewed and expressed an opinion about the Florida request on its way up the FEMA bureaucratic chain of command to the ultimate decision maker are internal matters of no genuine and significant public interest.  The Supreme Court has approved redaction of identifying information as a method of protecting *bona fide* Exemption 2 information while requiring disclosure of other information of significant and genuine public interest within the same document. <u>E.g.</u>, <u>Rose</u>, 425 U.S. at 370 n.8.  While plaintiffs may be correct that there is a great public interest in <u>how</u> FEMA decided which counties would be in the declared disaster area, and <u>how much</u> of the recovery effort would be federally funded and for <u>how long</u> (Doc. #48, p. 21), disclosure of the names and signatures would not shed any more light on these issues than the redacted Memorandum.

Indeed, FEMA has disclosed documents addressing each of these articulated areas of interest.

The Court concludes, however, that the redaction was not justified under Exemption 6 because the names and signatures did not constitute a "clearly unwarranted invasion of personal privacy" under § 552(b)(6). While employment at certain governmental agencies may indeed require secrecy, there is nothing about employment at FEMA or concurrence/non-concurrence in a county add-on request that would invoke "personal" privacy, much less constitute a clearly unwarranted invasion of that privacy. Disclosure will shed no light on activities as a private citizen or impair the purpose of Exemption 6 to "protect individuals from the injury and embarrassment that can result from the unnecessary disclosure of personal information." The Washington Post Co., 456 U.S. at 599 (emphasis added). Any incidental invasion of privacy is not protected by Exemption 6. Rose, 425 U.S. at 382. FEMA has not cited a single case applying Exemption 6 to such names and signatures. (Doc. #37, pp. 23-25).

Finally, FEMA has not cited any appellate authority supporting its argument that these redactions are within the scope of Exemption 5. (Id.). Neither of the two cases cited by FEMA (id., p. 23) applied Exemption 5 to identifying names and signatures. In the absence of any authority justifying the redaction under the deliberative process privilege of Exemption 5, the Court will reject this belated assertion.

In sum, the Court concludes that redaction pursuant to Exemption 2 was proper as to this Memorandum, but that Exemption 6 and Exemption 5 do not provide a proper basis for the redaction of the names and signatures.

**(4) Preliminary Damage Assessments Review:** An August 22, 2004, FEMA Memorandum (Doc. #32 at 0024) forwarded the recommendation of the Infrastructure Branch based on review of the Preliminary Damage Assessments of August 17-21, 2004. FEMA produced this Memorandum, but pursuant to Exemptions 2 and 6 redacted the identities of the FEMA employee who wrote the Memorandum[6], the employees who reviewed the request, and their signatures as either concurring or not concurring in the request. The signature of the Federal Coordinating Officer as concurring was not redacted; the redaction of the recommendation is no longer challenged.

For the reasons set forth at Section III(A)(3), the Court concludes that redaction pursuant to Exemption 2 was proper as to this Memorandum, but that Exemption 6 and Exemption 5 do not provide a proper basis for the redaction of the names and signatures.

**(5) Second Florida County Add-On Request:** On August 24, 2004, the Florida Governor's representative requested (Doc. #32 at 0005)

---

[6]FEMA's <u>Vaughn</u> index (Doc. #31, Exhibit B, p.3) identifies the person who wrote the Memorandum, so the issue of the propriety of withholding this name is moot.

that the FEMA Federal Coordinating Officer add six Florida counties to Public Assistance Categories C-G based upon a joint Preliminary Damage Assessment.  An August 24, 2004, FEMA Memorandum (Doc. #32 at 0004-13) forwarded the results of the Preliminary Damage Assessments conducted August 17-21, 2004, and the recommendation of the Infrastructure Branch to the FEMA Federal Coordinating Officer. FEMA produced this Memorandum, but  pursuant to Exemptions 2 and 6 redacted the identities of the FEMA employee(s) who wrote the Memorandum[7] and the identity of the employee(s) who reviewed the recommendation.  Plaintiffs no longer object to the redaction of the recommendation.

For the reasons set forth at Section III(A)(3), the Court concludes that redaction pursuant to Exemption 2 was proper as to this Memorandum, but Exemption 6 and Exemption 5 do not provide a proper basis for the redaction of the names and signatures.

**(6) Another Florida County Add-On Request:**  An August 25, 2004, FEMA Memorandum (Doc. #32 at 0003) forwarded the request by the Florida Governor's representative that six named Florida counties be added to those eligible for Public Assistance Categories C-G.  FEMA produced this Memorandum, but pursuant to Exemptions 2 and 6 redacted the identities of the FEMA employees

---

[7]FEMA's <u>Vaughn</u> index (Doc. #31, Exhibit B, p.3) identifies the person who wrote the Memorandum, so the issue of the propriety of withholding this name is moot.

who reviewed the request and their signatures as either concurring or not concurring in the request.

For the reasons set forth at Section III(A)(3), the Court concludes that redaction pursuant to Exemption 2 was proper as to this Memorandum, but Exemption 6 and Exemption 5 do not provide a proper basis for the redaction of the names and signatures.

**(7) Closure of Incident Period:**  An August 30, 2004, FEMA Memorandum (Doc. #32 at 0002) concerning a Request to Close the Incident Period reported that it was agreed with the Florida Governor's representative that the incident period for the Tropical Storm Bonnie/Hurricane Charley disaster would close effective midnight August 31, 2004, and that an amendment would be made to the FEMA-State Agreement.  FEMA produced this Memorandum, but pursuant to Exemptions 2 and 6 redacted the identities of the FEMA employees who reviewed the request and their signatures as either concurring or not concurring in the request.

For the reasons set forth at Section III(A)(3), the Court concludes that redaction pursuant to Exemption 2 was proper as to this Memorandum, but Exemption 6 and Exemption 5 do not provide a proper basis for the redaction of the names and signatures.

**(8)-(10) Florida Cost Share Request: FEMA Memorandum, Memorandum to President, and Briefing Document:**  On October 5, 2004, the Florida governor requested that President Bush adjust the cost share for the disaster declarations for the 2004 Florida

Hurricanes (Doc. #32 at 00041-42).  Governor Bush requested 90 percent Federal funding for Public Assistance costs for all four major disaster declarations.

An October 5, 2004, FEMA Memorandum (Doc. #32 at 0043-46) forwarded the cost-share request from Governor Bush to someone in FEMA.  FEMA produced this Memorandum but pursuant to Exemptions 2 and 6 redacted the identities of the FEMA employee(s) to whom the Memorandum was written and the signature(s) as either concurring or not concurring in the recommendation.  A signature block for non-concurrence [which had no signature], including the official's name, was not redacted.  The objection to the redaction of the recommendation has been withdrawn.

An October 7, 2004, Memorandum (Doc. #32 at 0032-33) from former Under Secretary Brown to President Bush requested and offered recommendations pertaining to the cost-sharing adjustment request from Florida.  A copy of the last page of October 7, 2004, Memorandum (Doc. #32 at 0031) contained additional handwritten notations.  FEMA withheld the entirety of each Memorandum copy pursuant to the deliberative process privilege of Exemption 5.

An undated Briefing, Request for Cost Share Adjustment State of Florida (Doc. #32 at 0027-30) reported the October 5, 2004, request from Governor Bush.  FEMA produced this Briefing document but pursuant to Exemptions 2 and 6 redacted the identities of the FEMA employees who reviewed the request and their signatures as either concurring or not concurring in the request, and pursuant to

-30-

the deliberative process privilege of Exemption 5 redacted the recommendation and the entire text under a "Talking Points" section.   Plaintiffs no longer object to the redaction of the recommendation, but do object to the withholding of the "Talking Points" section.

On October 7, 2004, President Bush signed a letter (Doc. #32 at 0035) to former Under Secretary Brown finding that damage from the tropical storm and four major hurricanes was of sufficient severity and magnitude that special conditions were warranted regarding cost sharing arrangements concerning Federal funds provided under the Stafford Act.   President Bush amended his prior declarations to authorize Federal funding for Public Assistance at 90 percent of the total eligible costs, except those categories previously approved at 100 percent.   This letter was fully disclosed by FEMA.

As to the **October 5, 2004 FEMA Memorandum**, the Court concludes that for the reasons set forth at Section III(A)(3), the redaction pursuant to Exemption 2 was proper as to this Memorandum, but Exemption 6 and Exemption 5 do not provide a proper basis for the redaction of the names and signatures.

As to the **October 7, 2004 Memorandum** from former Under Secretary Brown to President Bush, the Court rejects FEMA's suggestion that non-disclosure was justified by a proper invocation of executive privilege.   The Court has reviewed the Memorandum and

copy *in camera* and concludes that withholding the Memorandum pursuant to the deliberative process privilege of Exemption 5 was proper in part for the same reasons discussed at Section III(A)(1). The Memorandum was clearly an inter-agency memorandum from one government agency to another.  The Memorandum was "predecisional" within the meaning of the deliberative process privilege because it was prepared in order to assist President Bush in deciding whether to grant Florida's request that the federal share of the costs be increased, and was not merely peripheral to that decision.  The Memorandum was "deliberative" within the meaning of the deliberative process privilege because disclosure of the memorandum would expose the President's decision-making process in such a way as to discourage candid input from FEMA and thereby undermine the President's ability to function properly.  President Bush did not expressly adopt or incorporate the Memorandum in his final decision.  There is only one substantive section of the Memorandum, captioned "Background."   The Court finds that the last two paragraphs were properly withheld under the deliberative process privilege, but that the first three paragraphs must be disclosed as reasonably segregable factual material.  The handwritten notes on 0031 appear to be written on a "sticky" attached to the memorandum and appear to relate to the FOIA disclosure decision-making process.  This does not have to be disclosed.

As to the **undated Briefing document,** the Court concludes that for the reasons set forth at Section III(A)(3), the redaction pursuant to Exemption 2 was proper as to this Memorandum, but Exemption 6 and Exemption 5 do not provide a proper basis for the redaction of the names and signatures.  As to the **Talking Points**, plaintiffs argue that it cannot be determined whether the "Talking Points" are pre-decisional or post-decisional, and that no anonymous, undated document is entitled to Exemption 5 protection. (Doc. #48, p. 24).  The Court is not satisfied that Hoch v. CIA, 593 F.2d 675, 689 (D.C. Cir. 1984) stands for the general proposition that an anonymous memorandum cannot be part of the deliberative process privilege.  The Court has reviewed *in camera* the "Talking Points" portion of this document.  Both pages (0028, 0030) are identical;  nothing in the contents of this document establishes whether it was predecisional or deliberative.  The descriptions provided in the Vaughn Index (Doc. #31-3, p. 4) and Declaration of Daniel A. Craig (Doc. #37-3, p. 9) likewise do not establish either element of the deliberative process privilege. Since defendant has not established that the exemption applies to this document, it must be disclosed.

**(11) Draft Press Release:** An August, 2004 draft press release (Doc. #32 at 62) and an October, 2004 draft press release (Doc. #32 at 40) pertaining to cost-sharing adjustments for Florida were withheld in their entirety pursuant to the deliberative process

privilege of Exemption 5.  FEMA asserts that the nondisclosure was justified because these documents were non-finalized, draft press releases.

FEMA reports that the draft press releases were prepared by FEMA for use by the White House Office of Press Secretary once the President made the decisions.  FEMA further asserts that the press releases include "all pertinent information related to the declaration with the exception of the declaration date."  (Doc. #37, Exhibit 3, p. 10).  The Vaughn Index states that the draft press release was "From" the White House Office of Press Secretary (Doc. #31-3, p. 5).

The Court concludes that the draft press releases are not protected by Exemption 5.  FEMA has cited no case which approved withholding draft press releases, and the Court has found none. Simply labeling a document as a "draft," even if accurate, does not guarantee it will satisfy the requirements of Exemption 5.  While the press releases are pre-decisional in a chronological sense, they are certainly peripheral to the actual decision. Additionally, they are clearly not deliberative, but rather are merely a pre-prepared document announcing the decision once it has been made, subject to the insertion of the date.  FEMA has not carried its burden of establishing the draft press releases are within the scope of Exemption 5.  Accordingly, they must be disclosed.

**(B)** **Names and Addresses of Disaster Applicants and Flood Claimants:**

FEMA withheld the names, addresses, and physical addresses of damage for all applicants for Individual Assistance in connection with the 2004 Florida Hurricanes, and the names and physical addresses for flood claims submitted under FEMA's National Flood Insurance Program (NFIP). FEMA asserts that the Privacy Act, 5 U.S.C. § 552a, prohibited it from releasing such names and addresses, and that Exemption 6 of FOIA is applicable. Given the interplay of the Privacy Act and FOIA discussed earlier, the controlling issue is whether this information is within the scope of Exemption 6. Exemption 6 allows a government agency to withhold from disclosure "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6).

Names and addresses are typically "records" covered by the broad terms of the Privacy Act, and may be within the scope of Exemption 6 of FOIA. Federal Labor Relations Auth., 510 U.S. at 494; Ray, 502 U.S. 164; F.L.R.A. v. United States Dep't of Def., 977 F.2d 545, 547 n.3 (11th Cir. 1992)("Home addresses generally have been categorized as 'similar files' at least potentially protected by exemption 6."). See also Forest Guardians v. United States Fed. Emergency Mgmt. Agency, 410 F.3d 1214, 1218 (10th Cir. 2005)(Geographic Information System maps are "similar files" because they reveal specific geographic locations which, coupled with property records, can lead to the names and addresses of

individual owners of property insured by FEMA's National Flood Insurance Program).  The Court concludes that the names and addresses at issue in this case are "similar files" within the meaning of Exemption 6.

While names and addresses thus qualify under Exemption 6 as potentially protectable information, the Supreme Court has not held that release of a list of names and other identifying information is inherently and always a significant threat to the privacy of individuals on the list.  Rather, the issue is whether the disclosure of the names and addresses would constitute a clearly unwarranted invasion of the personal privacy of persons within the meaning of Exemption 6.  E.g., Federal Labor Relations Auth., 510 U.S. at 495; Ray, 502 U.S. at 174.  Whether the threat is de minimis or significant depends upon the characteristics revealed by virtue of being on the list and the consequences likely to ensue. Ray, 502 U.S. at 177 n.12.  To paraphrase Federal Labor Relations Authority, the Court must weigh the privacy interest of FEMA disaster assistance claimants and flood assistance applicants in the nondisclosure of their names and addresses against the public interest in the extent to which disclosure would shed light on FEMA's performance of its statutory duties or otherwise let citizens know what their government is up to.  510 U.S. at 497.

The privacy interest at stake in this case is substantial for several reasons.  First, release of the names and addresses of

those claiming government benefits will enable others to link the great deal of highly personal information already disclosed by FEMA to particular individuals. E.g., Ray, 502 U.S. at 175-76. Such information includes descriptions and quantities of items replaced, SBA status, water level, cause of damage, insurance status, personal property description, real property damage description, and damage level. It will also enable plaintiffs, or anyone else who wants the information, to link up with a variety of public databases to determine additional information about the named individuals. Plaintiffs counsel asserted at oral argument that plaintiffs intended to make such linkages with other public databases to determine what FEMA had done. See also Jeff Cull Declaration (Doc. #47, Exhibit 1, ¶ 8). The same process, however, can reasonably be expected to disclose an abundance of personal information about the individuals.

Second, public embarrassment or stigma is a factor to be considered. Ray, 502 U.S. at 176-77. Release of names and addresses will publicly identify not only a great number of victims of the 2004 Florida Hurricanes, but will identify those victims who received government assistance. While there is no inherent embarrassment or stigma in being the victim of a natural disaster, the same cannot necessarily be said about being the recipient of individual government assistance. Indeed, plaintiffs deem it potentially newsworthy to identify whether those who received such assistance are otherwise financially well-off. A recent article in

plaintiff The News-Press stated: "The News-Press also wants to investigate payments to residents in places such as Captiva Island - one of the richest areas in the nation - where at least 42 people received money. 'Without knowing who received aid, we can't evaluate whether neighbors were treated the same in Lee County, across Florida, or even nationwide,' said Kate Marymont, executive editor of The News-Press." "Opening FEMA's Books at Issue," The News-Press, October 2, 2005.

Third, release of a list of the names and addresses of over 600,000 disaster benefits claimants and 33,000 flood insurance claimants creates a reasonable danger of identity theft, not to mention actual theft. At oral argument plaintiffs stated that FEMA had paid generic amounts for loss of specific items, such as television sets. The FEMA records already released identify the generic amounts paid for loss of such additional items as microwave ovens, lawn mowers, sewing machines, washers and dryers, freezers, radios and computers. While the names and addresses of the recipients say little more about what FEMA did, they would say a great deal about the likely locations of new television sets, computers, etc.

Fourth, plaintiffs plan to make direct contact with at least some of the persons whose names and addresses would be disclosed. The intent to interview such individuals magnifies the importance of the personal privacy interest at stake. Ray, 502 U.S. at 177; Federal Labor Relations Auth., 510 U.S. at 500-01. Release of the

names and addresses makes the individuals the target of unsolicited and perhaps unwanted contact; those who wish to be interviewed can certainly volunteer by contacting the media.

Fifth, the names and addresses requested constitute a valuable source of information which is not available in another public source.  While names and addresses may be available from sources such as a telephone directory or public property records, the FEMA information is a list of disaster assistance claimants which is not available by that characterization elsewhere.  The legal requirement that other persons, such as commercial advertisers or solicitors, must be given the same access to FOIA information as the plaintiff newspapers, increases the individual privacy interest.  Federal Labor Relations Auth., 510 U.S. at 501; Forest Guardians, 410 F.3d at 1220 (disclosure of maps which would reveal names and addresses but also information about an individual's ownership of property, flood risks to the property, an individual's decision to purchase federally subsidized flood insurance through the NFIP, and the manner in which the property was purchased constituted an invasion of personal privacy); O'Kane v. United States Customs Serv., 169 F.3d 1308, 1309-10 (11th Cir. 1999) (U.S. Customs Service not required to disclose the addresses of individuals whose possessions it seized because their interest in privacy was not outweighed by interest of attorney who wanted disclosure so he could solicit the individuals for his law practice).  As National Association of Retired Federal Employees v.

Horner stated, "one need only assume that business people will not overlook an opportunity to get cheaply from the Government what otherwise comes dearly, a list of qualified prospects for all the special goods, services, and causes likely to appeal to" persons on the list.  879 F.2d 873, 878 (D.C. Cir. 1989).

Against this substantial privacy interest, the Court balances the relevant public interest.  The only relevant public interest in disclosure to be weighed in this balancing process "is the extent to which disclosure would serve the 'core purpose of the FOIA,' which is 'contribut[ing] significantly to public understanding *of the operations or activities of the government*.'"  Federal Labor Relations Auth., 510 U.S. at 497 (quoting Reporters Comm. for Freedom of the Press, 489 U.S. at 775) (emphasis in original).  See also Bibles, 519 U.S. at 355-56.

While FEMA initially suggested there was "slight" public interest (Doc. #37, p. 18), at oral argument FEMA's counsel acknowledged, with what appears to be understatement, that there is currently a public interest in FEMA's activities and operations. (Doc. #64, p. 20).  Indeed, plaintiffs have produced ample evidence in their filings (Docs. #47, 49) that there is a significant, legitimate public interest in the activities and operations of FEMA, both with regard to the 2004 Florida Hurricanes and generally.  The public interest in knowing whether FEMA has

adequately performed its statutory duties is certainly cognizable under FOIA.  E.g., Ray, 502 U.S. at 178.

The Court must balance the substantial privacy interests of the claimants against the significant, legitimate public interest in FEMA's activities and operations.  More specifically, the balance is between the substantial privacy interest and the extent to which disclosure of the names and addresses would contribute to the public understanding of the operations and activities of FEMA. The Court concludes that the balance weighs in favor of non-disclosure.  Disclosure of the names and addresses would say little more about FEMA, but would expose the claimants to predictable and obtrusive invasions of privacy.  On balance, the public interest can be adequately served by the disclosure of the redacted documents and disclosure of the unredacted documents already released by FEMA.  E.g., Ray, 502 U.S. at 178.

Release of the names and address will shed little additional light on FEMA's conduct.  "Because employee addresses say nothing about a federal agency's character or function, under Reporters Committee for Freedom of the Press, the public interest side of the balance here carries little weight."  F.L.R.A., 977 F.2d at 547 (employees' addresses exempt when requested by union representing the government unit).  Here, unlike F.L.R.A., disclosure of the addresses will say something about FEMA, at least to the extent they reveal the addresses at which physical damage was claimed to have occurred.  Nonetheless, the Court concludes that this carries

little weight in the overall scheme of things in the balancing process.

Plaintiffs' strongest argument is also the one which, if considered, tips the scale towards the privacy invasion side.  The plaintiff newspapers wish to make derivative use of the names and addresses.  Derivative use encompasses the situation where the names and addresses might provide leads for an investigative reporter seeking to ferret out what the government is up to.  Sheet Metal Workers Int'l Ass'n v. United States Air Force, 63 F.3d 994, 998 n.3 (10th Cir. 1995)(citing and quoting previous D.C. Circuit cases).  Here, plaintiff newspapers wish to utilize the names and addresses in part by interviewing the benefits claimants and thus obtaining information about the government from outside the FEMA files.

The public interest value and relevance of derivative use has not been decided by the Supreme Court, Ray, 502 U.S. at 179, and the Circuit Courts disagree.  Sheet Metal Workers Int'l Ass'n, 63 F.3d at 997-98.  In F.L.R.A., the Eleventh Circuit rejected the argument that there was a controlling public interest in addresses plaintiff could use to contact federal employees to learn something about the government.  977 F.2d at 547.  The F.L.R.A. court said, however, "[b]ut with no allegation that the government might be operating irregularly, the union cannot establish public interest based on something so tenuous." Id. at 548.  Here, there are allegations of FEMA misconduct involving waste and payment of

fraudulent claims.  FEMA records show more than 6,500 recoupment letters seeking to recover more than $27 million in benefits mistakenly paid by FEMA.  (Doc. #47, Exhibit 1, p. 2, ¶ 4).  Plaintiffs report a Congressional investigation into FEMA's operations and activities in connection with the 2004 Florida Hurricanes and other activities, and indictments in the Southern District of Florida involve criminal misconduct by citizens.  (Doc. #47, Exhibit 1, pp. 2-3).  Fraudulent activity by citizens following a hurricane would not be new.  E.g., United States v. Toussaint, 84 F.3d 1406 (11th Cir. 1995)(False claim for SBA loan where defendant claimed $360,000 damage from Hurricane Andrew but in fact suffered no loss).

The Court considers the potential derivative use articulated by plaintiffs, but finds that it does not tip the balance in favor of disclosure.  If anything, it does the opposite.

The Court finds that the privacy interest in the nondisclosure of their names and addresses of the 605,500 FEMA claimants and the 33,000 NFIA claimants substantially outweighs the FOIA-related public interest in disclosure.  The Court therefore concludes that disclosure would constitute a "clearly unwarranted invasion of personal privacy" within the meaning of 5 U.S.C. § 552(b)(6).  Accordingly, FOIA does not require FEMA to disclose the names and addresses, and the Privacy Act therefore prohibits their release.

**(C)   FEMA Contracts[8]**

In February, 2001 FEMA executed two contracts with outside contractors to perform and manage housing inspection services in disaster areas nationwide (the Contracts).   (Docs. #33 at 0076-0190; #34 at 0080-0196).   With the exercise of option years, the Contracts expired on September 30, 2005, and were valued at approximately $150 million each.   According to the Declaration of Chandra Lewis (Doc. #37, Exhibit 4, pp. 2-3), the Contracts were awarded pursuant to the bidding and award procedures of the Federal Acquisition Regulations (FAR).   FEMA advertised for the contracts, and received Business Proposals and Limited Written Technical Proposals from nine entities.   The Limited Written Technical Proposals included draft management plans for a Cultural Diversity Plan, a Staffing Plan, a Concept of Operations Plan, a Quality Control Plan, a Quality Assurance and Surveillance Plan, a Small Business and Small Disadvantaged Business Subcontracting Plan, and a Phase-In Plan.   FEMA evaluated each proposal, notified and negotiated with those offerors within the competitive range, then called for final proposal revisions.   Based upon technical and cost/price evaluation, FEMA awarded the contracts to PaRR Inspections and to Alltech, Inc. (collectively the Contractors).   FEMA incorporated the draft Management Plans/Technical Proposals by

---

[8]All references in this section are to defendants' Notice of Filing Redacted [or Additional] Documents Disclosed in Response to Plaintiffs' FOIA Request No. 05-113 (Docs. #33, 34, 44) followed by the page number on the lower right hand corner of the attachment.

reference into the resulting Contracts; FEMA modified and updated the plans periodically thereafter.  On June 28, 2005, and July 15, 2005, FEMA and the Contractors finalized the plans for Cultural Diversity Plan, Staffing Plan, Concept of Operations Plan, Quality Control Plan, Small Business and Small Disadvantaged Business Subcontracting Plan, and Phase-In Plan.

While the Contractors assert that the Contracts are "highly confidential," (Doc. #52, Exhibit 2, ¶ 8; Exhibit 3, ¶ 7), FEMA has disclosed most portions of the Contracts, and has disclosed the modifications which were executed between 2001 and the September 30, 2005 expiration date.  FEMA withheld certain portions of the Contracts, relying largely on Exemption 4.  The specific material withheld is discussed below.

Exemption 4 provides that FEMA is not required to disclose "trade secrets and commercial or financial information obtained from a person and privileged or confidential . . ."  5 U.S.C. § 552(b)(4).  Its purpose is to protect the interests of individuals who disclose information to government agencies and to protect the Government.  Shermco Indus., Inc. v. Secretary of the Air Force, 613 F.2d 1314, 1317 (5th Cir. 1980)(Unit B)(cost information by bidder was protected by Exemption 4 where the award of the government contract was not final).  "Commercial or financial information is confidential for purposes of the exemption if its disclosure will likely (a) impair the government's ability to obtain necessary information in the future or, (b) cause

substantial harm to the competitive position of the person from whom the information was obtained." The Miami Herald Publ'g Co., 670 F.2d at 613. "In order to show a likelihood of substantial competitive harm, the agency must show (i) that the entity that will suffer harm is in actual competition, and (ii) that substantial competitive injury will result from disclosure." Id. at 613-14. This does not require an actual adverse effect on competition, but the court must exercise its judgment in light of the nature of the material sought and the competitive circumstances. Id.

(1) **Identity of Key Personnel:** FEMA redacted from the disclosure of its Contract documents the names and positions/titles of the Contractors' "key personnel" pursuant to Exemptions 4 and 6. (Doc. #33 at 104; Doc. #34 at 108). Under the Contracts, these persons were considered essential to the work and could not be removed, replaced or diverted without notice and justification to FEMA. The declaration of FEMA employee Chandra Lewis (Doc. #37, Exhibit 4, p. 4) asserts that "[t]he disclosure of these names would harm the competitive interest of the contractors because potential competitors could contact the individuals to gain information as to the inner workings of the organization, attempt to recruit the key personnel, or otherwise interfere with essential employees." Belated declarations (Docs. #52, Exhibits 2, 3) by the Contractors' representatives agree with FEMA's evaluation of the information, using substantially the same verbiage. Further, the

-46-

Contractors assert that the information was voluntarily submitted to FEMA, and argue that disclosure would result in their objection to providing such information in the future.

The Court concludes that FEMA has not met its burden of showing that disclosure of the names and positions/titles of the "key personnel" listed in the 2001 Contracts will likely impair the government's ability to obtain necessary information in the future or cause substantial harm to the competitive position of the two Contractors.  The Contracts at issue have expired, and the names of key personnel may or may not be the same for future contracts.  The affidavits by Hugh J. Inglis and Lawrence W. Olinger make no reference to any attempts by their respective employers to protect their interest in the key personnel, such as confidentiality agreements, non-compete agreements, or the like.  Additionally, these declarations are conclusory, without factual support.

The Contractors assert that the information was voluntarily presented to FEMA, apparently attempting to provide a basis for FEMA to argue that a different Exemption 4 standard applies.  E.g., Delta Limited v. United States Customs & Border Prot. Bureau, __ F.Supp.2d ___, 2005 WL 2605599, *2 (D.D.C. Oct. 14, 2005).  There is no evidence that providing the names of such key personnel to FEMA was voluntary in the ordinary sense.  This identification of personnel, and the agreement with regard to their continued employment, was a negotiated term of a substantial contract and considered "required."  E.g., Martin Marietta Corp. v. Dalton, 974

F. Supp. 37, 39 (D.D.C. 1997).  In any event, FEMA does not assert that this lower standard is applicable.

FEMA also asserts that Exemption 6 protects the names of the Contractors' key personnel.  Ms. Lewis's Declaration asserts that there is no public interest to be served because release of the names could result in unwarranted invasions of privacy and the employees could become targets of inquiries pertaining to their job position, duties and coworkers.  (Doc. #37, Exhibit 4, p. 4).  Such concerns were apparently not sufficient as to FEMA's own employees, since FEMA has released the names and titles of its own key personnel in connection with the Contracts (Doc. #33 at 0092; Doc. #34 at 0096).  The Court concludes that the names and business titles generate a very limited privacy interest, and disclosure is not an unwarranted invasion of whatever privacy interest which may exist.

(2) Compensation Rate:  Pursuant to Exemption 4, FEMA redacted from the disclosure of its Contracts the amount of money the Contractors intended to pay its inspectors per inspection and the inspector's compensation rate.  (Doc. #33 at 0109; Doc. #34 at 0113).  Elsewhere, the Contracts disclose the price per inspection (Doc. #33 at 0079-81; Doc. #34 at 0083-85), and FEMA disclosed the most recent increase in the cost per inspection.  (Doc. #33 at 0002; Doc. #34 at 0002).  Other inspection rate information was also disclosed.  (Doc. #34 at 0011).  Further, at least one Florida newspaper has quoted a FEMA inspector, disclosing the rate FEMA

paid per inspection.  "2004 Hurricane Season: Quality Checks Led to FEMA Firings," <u>The Miami Herald</u>, May 15, 2005, 2005 WLNR 7655773.

The Court concludes that FEMA has not met its burden of showing that disclosure of the compensation rate negotiated in the 2001 contracts will likely impair the government's ability to obtain necessary information in the future or cause substantial harm to the competitive position of the two contractors.

**(3) Section J Draft Plans**: Pursuant to the deliberative process privilege of Exemption 5, FEMA withheld draft versions of the following portions of Section J of its contracts:  the contractor's Cultural Diversity Plan; the contractor's Staffing Plan; the contractor's Concept of Operations Plan; the contractor's Quality Control Plan;  the contractor's Small Business and Small Disadvantaged Business Plan; and the contractor's Phase-In Plan (Doc. #33 at 0121-22; Doc. #34 at 0125-26).  FEMA has offered to produce the finalized plans after they have been reviewed for Exemption 4 material, but to date has failed to do so.

FEMA disclosed portions of the Contract modifications which quoted paragraphs of some of these withheld provisions in their entirety.  (Doc. #33 at 0011-13; 0014-191 0032-34; Doc. #34 at 0017-19; 0020-22; 0027-30; 0036-38; 0056-59).  The Court doubts that a "draft" of a contract provision which is shared with third parties as part of contractual negotiations qualify under the deliberative process privilege.  In any event, the "draft"

provisions were incorporated into the completed Contracts, and existed in draft form until mere months before the Contracts expired.  Plaintiffs have offered to accept the finalized version of these Contract provisions, but FEMA has not yet produced them. The Court concludes that FEMA must produce either the draft versions or the final version.

**(4) Section K of Contract:** Pursuant to Exemption 4, FEMA redacted the final version of Section K of the contracts, relating to Representations, Certifications, and Other Statements of Offerors. At oral argument plaintiffs withdrew their objections to the failure to disclose the tax identification numbers (Doc. #64, p. 88), and defendant conceded that the names of the company principals could not be withheld (id., p. 73).

FEMA withheld the identity, quantity and value of certain government-owned equipment the contractors intended to use.  (Doc. #44, Exhibit A, at 0203).  However, when the Contract modifications were disclosed, some the withheld information was also disclosed. (Doc. #33 at 0002-04, 0028, 0097; Doc. #34 at 0002-04, 0034, 0101).

The Court concludes that FEMA has not met its burden of showing that disclosure of the identity, quantity and value of certain government-owned equipment the Contractors intended to use in connection with the 2001 contracts will likely impair the government's ability to obtain necessary information in the future or cause substantial harm to the competitive position of the two contractors.

Accordingly, it is now

**ORDERED:**

1.  Defendant's Motion for Summary Judgment (Doc. #37) is **GRANTED IN PART AND DENIED IN PART.**

2.  Plaintiffs' Motion for Summary Judgment (Doc. #46) is **GRANTED IN PART AND DENIED IN PART.**

3.  The Clerk of the Court shall enter judgment on the Second Amended Complaint (Doc. #27) as follows:

(A) Count One of the Second Amended Complaint is **dismissed** as moot.

(B) As to Count Two of the Second Amended Complaint, the United States Department of Homeland Security, and its component the Federal Emergency Management Agency, shall provide defendants with accurate copies of the following documents or portions of documents:

(1) August 13, 2004 Memorandum (Doc. #32 at 0065-0069), only sections captioned "Event," "Background," "Attachment," "Detailed Discussion," and State Map.

(2) August 15, 2004 Memorandum (Doc. #32 at 0047-49, 0054-56), only sections captioned "Background" and "Attachments."

(3) October 7, 2004 Memorandum (Doc. #32 at 0032-33), only the first three paragraphs of the "Background" section.

(4) The undated "Talking Points" (Doc. #32 at 0028, 0030) in its entirety.

(5) The draft press releases (Doc. #32 at 0040, 0062) in their entirety.

(6) Those portions of the Contracts relating to the identification of key personnel (Doc. #33 at 0104; Doc. #34 at 0108).

(7) Those portions of the Contracts relating to compensation rate of inspectors (Doc. #33 at 0109; Doc. #34 at 0113).

(8) The Section J draft plans to the Contracts concerning the Contractor's Cultural Diversity Plan, the Staffing Plan, the Concept of Operations Plan, the Quality Control Plan, the Small Business and Small Disadvantaged Business Plan, and the Phase-In Plan (Doc. #33 at 0121-22; Doc. #34 at 0125-26), or at defendant's option, the finalized version of these plans.

(9) The portion of the Contracts relating to the identity, quantity and value of certain government-owned equipment the Contractors intended to use (Doc. #44 at 0203).

Otherwise, judgment as to Count Two shall be entered in favor of defendant.

4.  Documents required to be produced shall be produced on or before December 5, 2005, unless there is a notice of appeal filed

by defendant.   If defendant does file a notice of appeal, disclosure of the documents set forth above will be stayed until the conclusion of the appeal.

　　5.  The Clerk shall close the case.

　　**DONE AND ORDERED** at Fort Myers, Florida, this ___4th___ day of November, 2005.


                                    _____
                                    JOHN E. STEELE
                                    United States District Judge


Copies:
Counsel of record